U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2015 MAR 30 PM 1:56

CLERK
BY_____
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

UNITED STATES OF AMERICA )
)
v. ) Case No. 5:14-cr-00114-01
)
SHAEEN C. JENKINS, )
)
Defendant. )

**OPINION AND ORDER RE:**
**DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**
**(Doc. 14)**

On September 15, 2014, two law enforcement officers approached a vehicle parked in a Motel 6 parking lot near Exit 16 off Interstate 89 in Colchester, Vermont. Defendant Shaeen C. Jenkins was a passenger in the vehicle. Based on information gathered prior to and during the encounter, the officers suspected that a narcotics transaction was taking place. Following a pat-down search and a brief altercation, Jenkins was arrested and found to possess eighteen grams of crack cocaine. He is charged with possession with intent to distribute cocaine base, a Schedule I Controlled Substance, in violation of 21 U.S.C. § 841(a)(1).

Jenkins filed a motion seeking to suppress the evidence gathered as a result of the stop on the grounds that he was stopped without reasonable suspicion and subsequently seized or arrested without probable cause. (Doc. 14.) The court conducted a hearing on Jenkins' motion on February 5, 2015 and February 9, 2015.

## I. Facts

The court makes the following findings based upon the testimony and evidence admitted at the suppression hearing. As an initial matter, the court finds that the testimony of Officer Daniel Merchand and DEA Agent Timothy Hoffmann was credible in all respects.

On September 10, 2014, DEA Task Force Officer Daniel Merchand met with a confidential informant who admitted currently abusing narcotics. The informant had been

buying drugs from two individuals, known to him or her as "V" and "Blue." The informant did not know the true identity of Blue, but stated that V's real name was Gerard Johnson. The CI stated that Johnson was at that time in the Bronx and was expected to return to the Burlington area within several days with approximately seventy to eighty grams of crack cocaine and a number of buprenorphine pills. Tr. 20-25.[1]

Two days later on September 12, 2014, Officer Merchand learned that on September 11, 2014, Vermont State Police had stopped a New York-registered vehicle traveling northbound on Interstate 89 near Hartford, VT. During the traffic stop, police identified the three male occupants of the vehicle as Darryl J. Thompson, Gerard Johnson (the male identified by the CI as "V"), and Shaeen Jenkins. Tr. 26-27. Officer Merchand recalled the name of Gerard Johnson from his previous conversation with the informant. He formed a suspicion that there were illegal drugs in the car. Tr. 27.

On September 15, 2014 at about 12:15 p.m., Officer Merchand and DEA Special Agent Tim Hoffmann were in the vicinity of Exit 16 conducting surveillance for an unrelated case. Both officers knew that the parking lots and motels at Exit 16 were frequently used by drug dealers. Tr. 20, 81. The agents observed a white Chevrolet Malibu drive past the Quality Inn twice within approximately three minutes and then enter the Motel 6 parking lot, which was adjacent to a McDonald's parking lot. The vehicle parked in a spot removed from the entrance to the motel and adjacent to the tree line. Tr. 33-34. The two occupants remained in the Malibu. The passenger's seat was pushed back so that the passenger was hardly visible.

Five minutes later, a dark blue Chevrolet pickup truck entered the McDonald's parking lot. The driver of the truck was talking on his cell phone and remained parked for approximately two minutes. The truck then exited the McDonald's parking lot and entered the Motel 6 parking lot, parking alongside the Malibu. The man driving the truck exited his vehicle and entered the rear passenger side door of the Malibu. After a brief period, the driver of the truck left the Malibu and walked into the Motel 6. A few minutes later, the same man left the motel and got back into his original seat in the rear of the Malibu. Tr. 38.

---

[1] All references are to the transcript for the hearing on February 5, 2015 unless otherwise indicated.

At this point, the two officers decided to interview the occupants of the Malibu. Officer Merchand drove his unmarked SUV to within twenty feet of the Malibu. He came to a stop at a thirty degree angle directly behind the Malibu. Although the Malibu could have driven off, the maneuver would have required backing and filling in a manner similar to leaving a parallel parking spot. Tr. 76.

The two officers approached the white Malibu from different sides. Officer Hoffmann was on the passenger side. They identified themselves as police or DEA officers. Tr. 45, 96. Officer Merchand spoke with the driver of the vehicle, later identified as Timothy Hatgen, while Agent Hoffmann spoke with the front seat passenger, later identified as defendant Jenkins. Officer Merchand told the driver not to move and to place his hands on the steering wheel. Tr. 7-8 (02/09/15 Hatgen testimony). Agent Hoffmann displayed his badge to defendant. Tr. 47, 96-97. Hoffmann asked defendant what his name was, and defendant identified himself as "Shaeen." Officer Merchand asked if his last name was "Jenkins," and defendant confirmed that it was. Tr. 51. Merchand stated that he also asked Jenkins if his nickname was "V" or "Blue." Jenkins was surprised that the officers knew his identity. Tr. 51-52.

While Jenkins was still in the passenger seat, Agent Hoffmann asked permission to pat him down for weapons. Jenkins said, "Go ahead," and climbed out of the Malibu. Tr. 99. Agent Hoffmann then asked him to place his hands on the roof of the car. Tr. 100. Jenkins complied with the agent's request. Agent Hoffmann began to pat him down starting at the bottom of his legs.

During the patdown, Agent Hoffmann announced that he felt something hard in the lower portion of Jenkins' buttocks and asked Jenkins what the object was. Jenkins replied that it was "his dick." Tr. 54. Agent Hoffmann then ordered Jenkins to place his hands behind his back to be handcuffed. According to the affidavit, Jenkins pulled away from Hoffmann, struck him in the right eye and attempted to flee. A short physical struggle ensued, and Jenkins was subdued, arrested and handcuffed.

Jenkins was transported to the Colchester Police Department in a marked police vehicle. Police searched the police vehicle prior to Jenkins being placed inside to ensure there was no contraband. Tr. 110. When the cruiser arrived at the police department, officers opened the rear

3

door and observed plastic sandwich bags with an off-white colored substance that appeared to be crack cocaine on the rear driver's side floorboard. Tr. 111. Photographs were taken of the suspected crack cocaine. Jenkins was removed from the vehicle. He had what appeared to the officers to be granules of crack cocaine on his hands and on the rear of his pants. Tr. 62, 112. He was subsequently searched, and additional suspected crack cocaine was found in his underwear and on his buttocks. The substance was field-tested, resulting in a positive test for the presence of crack cocaine. The drugs weighed approximately eighteen grams in all. Tr. 113. The police also seized four prescription pills contained in a plastic sandwich bag and two cell phones from Jenkins. Tr. 112.

## II.      Analysis

Jenkins seeks to suppress all evidence obtained as a result of the traffic stop and subsequent arrest. The initial "burden of production and persuasion generally rest[s] upon the movant in a suppression hearing." *United States v. Arboleda*, 633 F.2d 985, 989 (2d Cir. 1980) (internal citations omitted). When a search is conducted without a warrant, the Government assumes the burden of persuasion to justify the search. *Id.* The Government must ultimately show, by a preponderance of the evidence, that the officers acted lawfully and that the evidence is not tainted. *See United States v. Matlock*, 415 U.S. 164, 178 (1974) ("[T]he controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence.").

### A.      Stop of Defendant

Defendant contends that the initial stop by the DEA agents was unsupported by reasonable suspicion and therefore all evidence and statements obtained as a result of the stop must be suppressed. The Government responds that the encounter that occurred between the agents and defendant was consensual, and even if defendant was in fact "seized" or suffered some deprivation of liberty under the Fourth Amendment, reasonable suspicion supported a *Terry* stop and frisk of the defendant.

There are three distinguishable types of encounters between law enforcement personnel and individuals, "each with different ramifications under the Fourth Amendment." *United States v. Glover*, 957 F.2d 1004, 1008 (2d Cir. 1992) (citing *United States v. Hooper*, 935 F.2d 484, 490

(2d Cir. 1991)). The first type is a consensual encounter, in which an individual willingly agrees to speak with a law enforcement officer. *Id.* These brief encounters, which may be initiated by the officer without any objective level of suspicion, are not considered "seizures" under the Fourth Amendment and thus do not implicate any constitutional protections. *Id.*; *see also Florida v. Royer*, 460 U.S. 491, 498 (1983). The second type of encounter between police and individuals involves an investigative stop based on the principles of *Terry v. Ohio*, 392 U.S. 1 (1968). *Glover*, 957 F.2d at 1008. "Although limited in scope, such investigative detentions are 'seizures' under the Fourth Amendment, and must be based on 'a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'"" *Id.* (citing *Hooper*, 935 F.2d at 490; *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). Finally, the third type of encounter is an arrest, which must be based upon a showing of probable cause to believe that a criminal offense has been committed. *Id.*; *Royer*, 460 U.S. at 498.

To determine whether an encounter between law enforcement and an individual complies with the Fourth Amendment, the court must first determine what type of encounter occurred. The court then must apply the proper standard of proof to the facts to determine the encounter's legality. *United States v. Lopez*, No. 95-CR-40-02, 1995 WL 852067, at *5 (D. Vt. Dec. 18, 1995).

### i. Consensual Encounter

The Government first contends that the encounter between defendant and the agents was consensual, and therefore no suspicion of criminal activity was required. (Doc. 21 at 12.) An encounter is considered to be consensual if a reasonable person in the defendant's position would have felt free to terminate the encounter and leave the area. *See United States v. Drayton*, 536 U.S. 194, 201 (2002) ("If a reasonable person would feel free to terminate the encounter, then he or she has not been seized.").

This court has previously addressed the question of what factors may determine whether there is a restriction on liberty of movement triggering Fourth Amendment protections. In *United States v. Lopez*, an agent stepped in front of a vehicle, badge extended and ordered the occupants to stop. The agent informed the defendant that he wanted to speak with him. 1995 WL 852067, at *2. The court concluded that the show of force together with compliance by the

5

individual constituted a *Terry*-type seizure. *Id.*, at *5. More recently, in *United States v. Allen*, agents approached the defendant at night as she was preparing to exit a vehicle in a private driveway, stood on either side of the vehicle effectively blocking the vehicle's occupants from exiting, and left their vehicle parked so that it partially blocked the defendant's vehicle from exiting the driveway. No. 5:13-CR-145, 2014 WL 2327315, at *5 (D. Vt. May 29, 2014). The court concluded that a reasonable person in a similar position may not have felt free to terminate the encounter with police, making the encounter a nonconsensual *Terry* stop. *Id.* (citing *Drayton*, 536 U.S. at 204, for the proposition that the type of encounter depends in part on whether there was "intimidating movement" and/or "blocking of exits" by officers).

Similarly here, when Officer Merchand parked his car twenty feet behind the Malibu and the agents approached on either side of the vehicle, the occupants' freedom of movement was certainly limited. The Malibu was no longer free to pull out of its parking spot. The driver was told not to move and to keep his hands on the steering wheel. Tr. 7-8 (02/09/15 Hatgen testimony). This instruction further limited the driver's ability to leave the scene. Both officers showed their badges. Agent Hoffmann requested Jenkins' consent to a patdown search for weapons and asked Jenkins to exit the vehicle. It is unlikely that a reasonable person in defendant's situation would have believed that he was free to cease communicating with the agents and to leave the area. A reasonable person, including a law-abiding person with no fear of discovery, would have felt compelled to stay in the parking place and speak with the officers until told he or she could leave. No reasonable person would believe he or she could end the encounter by driving away from two officers holding up their badges. The initial encounter between the agents and the individuals was not consensual, and thus reasonable suspicion was required to justify the stop.

### ii.     *Terry* **Stop**

Under *Terry v. Ohio,* a police officer "may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *Terry*, 392 U.S. at 27). Further, the police may pat down the individual if they reasonably believe he is armed and dangerous. *United States v. Colon,* 250 F.3d 130, 134 (2d Cir. 2001).

Reasonable suspicion "requires considerably less of a showing than probable cause." *United States v. McCargo*, 464 F.3d 192, 197 (2d Cir. 2006). In making a reasonable-suspicion determination, the court must examine "the 'totality of the circumstances' of each case to see whether the detaining officer has a 'particularized and objective basis' for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002). An officer "'must be able to point to specific and articulable facts which . . . reasonably warrant [the] intrusion.'" *United States v. Padilla*, 548 F.3d 179, 187 (2d Cir. 2008) (quoting *Terry*, 392 U.S. at 21). While an officer "may not rely on an inchoate and unparticularized suspicion or hunch," he or she may use his or her own "experience and specialized training to make inferences from and deductions about the cumulative information available to [him or her] that might well elude an untrained person." *Padilla*, 548 F.3d at 187 (internal quotation marks and citations omitted).

The question in this case is whether the two officers had a reasonable and articulable suspicion that the occupants of the Chevrolet Malibu were engaged in criminal activity based on the totality of the circumstances. Their basis for suspicion arose from a combination of information that a shipment of drugs were on the way to Burlington and their observation of behavior in the parking lot which was consistent with drug dealing.

Agent Hoffmann and Officer Merchand had prior knowledge from an informant and from intelligence gathered during the earlier traffic stop on I-89 that individuals would be travelling to the Burlington area from the Bronx, transporting approximately seventy to eighty grams of crack cocaine and buprenorphine pills. Through his conversation with the informant, Officer Merchand learned that the individuals transporting the narcotics were known by the nicknames "Blue," whose true identity was not known to the CI, and "V," identified by the CI as Gerard Johnson. Around the same time, Officer Merchand learned that Vermont State Police had stopped a vehicle with New York plates traveling northbound on I-89. (Doc. 1-1 at 1-2.) Of the vehicle's three male occupants, one was identified as Gerard Johnson, the male identified by the CI as "V," and a second individual was identified as Shaeen Jenkins.

The location near Exit 16 where the officers were conducting surveillance is known to be frequently used for drug transactions. Tr. 18-19, 81. The agents were familiar with the use of the McDonald's and Motel 6 parking lots for drug sales. Tr. 19-20. *See Arvizu*, 534 U.S. at 276 (stating that officers are entitled to assess situations in light of their experience and familiarity

with a particular area and its inhabitants). While "[a]n individual's presence in an area of expected criminal activity" cannot alone "support a reasonable, particularized suspicion that the person is committing a crime," the Supreme Court has noted "the fact that the stop occurred in a 'high crime area' [is] among the relevant contextual considerations in a *Terry* analysis." *Wardlow,* 528 U.S. at 124; *Adams v. Williams*, 407 U.S. 143, 144 (1972)). Thus, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Id.*; *see also McCargo,* 464 F.3d at 197 (evaluating physical proximity to a high-crime area, as well as temporal proximity to crime scene, to conclude officers had reasonable suspicion).

Based on their training and experience, the two officers suspected that the individuals were acting in a manner consistent with the practices of drug dealers. Tr. 40, 94. The agents observed a white Chevrolet Malibu drive past them twice within approximately three minutes, and then park in the Motel 6 parking lot. Tr. 30-33, 87-90. Agents then saw a blue pickup truck briefly stop in the adjacent McDonald's parking lot where the driver made a phone call, and then observed the truck drive to the Motel 6 lot and park next to the Malibu. The officers watched the driver of the truck exit his own vehicle, briefly enter the rear passenger seat of the white Malibu, then enter the Motel 6 before returning and re-entering the Malibu. Although this sequence of events could reflect entirely blameless activity such as friends meeting to have lunch, it is also consistent with people meeting in order to rent a hotel room for use by a drug dealer. Tr. 94. Even considered in the most charitable light, the sequence of events was peculiar. The convergence of two cars at the far end of a parking lot in an area known for high levels of drug trafficking, followed by a visit by one driver to the other vehicle and a quick trip into Motel 6 are consistent with and indicative of drug trafficking. Officer Merchand and Agent Hoffmann recognized this behavior as drug-related activity. Tr. 40, 94, 102. *See United States v. Bayless,* 201 F.3d 116, 133 (2d Cir. 2000) ("In the case of a suspected drug transaction, this circuit has held that the reasonable suspicion inquiry must ask if "the conduct would appear suspect to one familiar with the practices of narcotics couriers, albeit the pattern of behavior is innocuous to the untrained observer.").

Defendant argues that the stop was unsupported by reasonable suspicion because the scenario "is consistent with nothing more than individuals meeting for lunch or a variety of other

non-nefarious reasons." (Doc. 14 at 4.) However, even conduct that is seemingly innocent may form the basis for reasonable suspicion that criminal activity is afoot. *Sokolow*, 490 U.S. at 9; *see also Terry*, 392 U.S. at 23 (recognizing that a series of acts, each perhaps innocent in itself, can when taken together warrant further investigation); *see also Arvizu*, 534 U.S. at 277 ("A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct.").

The totality of the circumstances justifying the stop include: (1) the information received by the confidential informant that individuals by the names of "V" (Gerard Johnson) and "Blue" would be arriving to the Burlington area within the following several days with a number of grams of crack cocaine; (2) the intelligence obtained by Vermont State Police conducting a traffic stop that individuals identified as Darryl J. Thompson, Gerard Johnson and Shaeen Jenkins were traveling northbound on I-89 near Hartford, VT in a New York-registered vehicle; (3) the agents' familiarity with the McDonald's and Motel 6 parking lots and knowledge that these locations were frequently used for drug transactions; and (4) the observation of behavior by the individuals that would appear suspect to one familiar with the practices of a narcotics courier. Considering these factors in the aggregate, Agent Hoffmann and Officer Merchand had a particularized and reasonable, objective basis for suspecting that the occupants of the Malibu were engaged in criminal activity, thus making the *Terry* stop and questioning of defendant permissible under the Fourth Amendment. Furthermore, the agents were justified in requesting defendant to exit the vehicle. *See Maryland v. Wilson*, 519 U.S. 408, 415 (1997) (holding that "an officer making a traffic stop may order passengers to get out of the car pending completion of the stop.").

### iii.     Pat Down of Defendant

According to the Government, Jenkins consented to the patdown. (Doc. 1-1 at 2.) If the encounter between the police and the individual is "a justifiable *Terry*-type detention," then the defendant's "consent, if voluntary" effectively legalizes a search conducted during that detention. *Royer*, 460 U.S. at 501.

The court does not need to decide whether the patdown was consensual because it was lawful as part of the *Terry* stop even without Jenkins' consent. A patdown search is permitted

without consent if necessary to ensure the safety of the officer. In this case, the two officers had formed a reasonable suspicion that defendant was involved in illegal drug trafficking. Prior to requesting Jenkins to submit to the patdown, Officer Merchand had connected him with the car stopped a few days before on I-89 and with the information provided by the informant. Although Agent Hoffmann knew less about this intelligence information, he understood that Officer Merchand had identified Jenkins by name and by nickname as a person involved in illegal drug sales.

An officer with reasonable suspicion that an individual is armed and dangerous may perform "a limited search of outer clothing for weapons" to protect the safety of both the officer and the public if the initial stop "is justified by suspicion . . . that criminal activity is afoot." *Arizona v. Johnson*, 555 U.S. 323, 330 (2009). To justify the officer in proceeding from a stop to a patdown or frisk, he or she must have reason to believe that the person detained is armed and dangerous. *Id.* at 323. The purpose of this limited search "is not to discover evidence of crime, but to allow the officer to pursue his investigation without fear of violence." *Padilla*, 548 F.3d at 187 (citing *Adams*, 407 U.S. at 146). For this reason, the officer "need not be absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." *Terry*, 392 U.S. at 27.

Because narcotics trafficking is frequently violent in nature, courts have found officers justified in making protective frisks when a suspect has been stopped upon the suspicion that he or she has, was, or is about to commit this type of crime. In these circumstances, "the officer's reasonable belief may derive as much from his experience in similar cases as from his precise knowledge of the dangerous propensities of the suspect at hand." 4 Wayne R. LaFave, *Search & Seizure* § 9.6(a) (5th ed.) (citing *United States v. Sinclair*, 983 F.2d 598 (4th Cir. 1993)). The court recognizes that a majority of the lower court decisions include additional factors beyond the reasonable suspicion that the individuals were involved in narcotics transactions. *See, e.g., United States v. Vasquez*, 634 F.2d 41, 43 (2d Cir. 1980) (finding detectives' protective frisk proper after defendant bent down and reached under his seat, "particularly in view of the violent nature of narcotics crime"); *United States v. Reyes*, 353 F.3d 148, 154 (2d Cir. 2003) (finding that an officer, based on the circumstances surrounding a drug transaction and knowledge that

10

the defendant, a known narcotics dealer, routinely carried a firearm, "had a solid basis for the belief that [defendant] was armed and that the concealed weapon posed a danger to the police and to the public"); *see also United States v. Trullo*, 809 F.2d 108, 113-14 (1st Cir. 1987) (stating that "concealed weapons [are] part and parcel for the drug trade" and finding that the frisk for weapons properly occurred when officer noted a bulge in defendant's pocket during seizure of a trafficking suspect); *United States v. Gilliard*, 847 F.2d 21, 25 (1st Cir. 1988) (holding that the precautionary decision to frisk the defendant was based on reasonable suspicion because officers suspected defendant of participating in a narcotics sale, knew that firearms are "tools of the trade," and witnessed defendant acting "peculiarly and nervously"). Such additional case-specific evidence of the presence of a weapon is not a fixed requirement for a *Terry* patdown. People engaged in drug trafficking may be volatile and dangerous and a limited search for weapons is frequently appropriate when suspicion of drug dealing is present. Agent Hoffmann was justified in conducting such a search of defendant's outer clothing for his own safety. *See United States v. Salazar*, 945 F.2d 47, 52 (2d Cir. 1991) (holding that given the totality of circumstances, including an informant's tip and fitting the description of the drug dealer, provided officers with a sufficient basis to conduct an immediate patdown).

In *United States v. Ramirez*, the Southern District for the District of New York noted that the Second Circuit "has approved protective action even in cases where there was a reasonable suspicion that the subject of the frisk had simply purchased narcotics, where the totality of the circumstances indicated that 'a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger.'" *United States v. Ramirez*, No. 02 CR. 1228 (GEL), 2003 WL 260572, at *6 (S.D.N.Y. Feb. 5, 2003) (citing *United States v. Alexander,* 907 F.2d 269, 272 (2d Cir. 1990)). In *Ramirez*, the court concluded that "where a police officer reasonably suspects that he has interrupted a drug sale or other narcotics-related transaction in progress . . . in a location noted for narcotics activity and disorderly behavior, and the officer and a single colleague are faced with three suspects, one of whom has acted nervously and failed to respond to the officer's questions, a prudent officer behaves quite reasonably in undertaking a limited pat-down search to detect any weapons that could harm the officer, his partner, or members of the public." Similarly here, the agents were observing a location known to be one frequently used for illegal drug transactions. They observed behavior typical of individuals involved in the drug trade. Upon approaching the parked vehicle, the agents were

outnumbered by the car's occupants. Tr. 101. The agents had no radios from which to call for backup if necessary. Tr. 101-02. The identity of defendant as a suspected narcotics trafficker was determined at the scene when he identified himself as Shaeen Jenkins. Viewing the circumstances of this encounter "through the eyes of a reasonable and cautious police officer on the scene, guided by his experience and training," *Padilla*, 548 F.3d at 189, it was reasonable to infer that the defendant could be armed and dangerous, and therefore the officers had sufficient reason to pat him down immediately.

## B.     Arrest of Defendant

Defendant further contends that his arrest was unsupported by probable cause and therefore the fruits of the arrest must be suppressed. (Doc. 14 at 4.) Defendant claims that the discovery of the hard object in his pants did not provide probable cause to support an arrest. (Doc. 14 at 5.)

An arrest must be supported by "probable cause." *United States v. Clark*, 552 F. App'x 40, 42 (2d Cir. 2014) (citing *United States v. Vargas*, 369 F.3d 98, 101 (2d Cir. 2004). A determination of probable cause is objective, and exists when an officer is "in possession of facts sufficient to warrant a prudent person to believe that the suspect had committed or was committing an offense." *Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997).

### i.     Use of Handcuffs

At the time that defendant hit Agent Hoffmann, the agent was attempting to handcuff defendant. The issue is whether placing defendant in handcuffs turned the investigatory *Terry* stop into a custodial arrest, and if so, whether the arrest was supported by probable cause.

A permissible investigatory stop can become an arrest requiring probable cause if the means of detention are "more intrusive than necessary." *United States v. Perea*, 986 F.2d 633, 644 (2d Cir. 1993). Courts generally look to the amount of force used to detain the individual, the need for such force, the extent to which freedom of movement is retrained, and similar factors when distinguishing a *Terry* stop from an arrest. *See Clark*, 552 F. App'x at 42-43 ("In determining whether an investigatory stop is sufficiently intrusive to ripen into a de facto arrest, the Second Circuit considers the amount of force used by the police, the need for such force, and

the extent to which an individual's freedom of movement was restrained, and in particular such factors as the number of agents involved, whether the target of the stop was suspected of being armed, the duration of the stop, and the physical treatment of the suspect, including whether or not handcuffs were used.") (quotation omitted).

Under ordinary circumstances, the use of handcuffs is not part of a *Terry* stop. *Vargas*, 369 F.3d at 102. However, "intrusive and aggressive police conduct is not an arrest when it is a reasonable response to legitimate safety concerns on the part of the investigating officers." *Id.* (internal quotations omitted). Circuit courts have previously held that if justified by the circumstances, an officer's use of handcuffs does not necessarily turn a limited investigatory stop into an arrest requiring probable cause. *See United States v. Miles,* 247 F.3d 1009, 1012 (9th Cir. 2001) (explaining that intrusive police conduct such as using handcuffs is not an arrest "when it is a reasonable response to legitimate safety concerns on the part of the investigating officers") (internal citation omitted); *United States v. Shareef,* 100 F.3d 1491, 1504 (10th Cir. 1996) (holding that police performing investigative stop were justified in removing defendants from cars and detaining them in handcuffs where driver was reasonably suspected of being armed); *United States v. Hastamorir,* 881 F.2d 1551, 1557 (11th Cir. 1989) (holding that handcuffing of defendant during *Terry* stop was reasonable to provide for safety of officers); *United States v. Brown,* 79 F.3d 1499, 1510 (7th Cir. 1996) (stating that "where safety is at issue handcuffing is not a *per se* arrest"); *see also Dempsey v. Town of Brighton,* 749 F. Supp. 1215, 1223 (W.D.N.Y. 1990) (concluding that handcuffing of suspect while police frisked him for weapons did not convert investigatory stop into arrest), *aff'd without opinion,* 940 F.2d 648 (2d Cir. 1991).

The relevant questions are whether a reasonable basis exists for officers to suspect that the detained individual poses a physical threat and whether the use of handcuffs is the least intrusive means to protect against the threat. *Id.* Here, the agents had reason to believe that defendant might have been armed and dangerous, giving them justification to perform a lawful *Terry* patdown. During the patdown, Agent Hoffmann announced that he felt something hard in the lower portion of defendant's buttocks. (Doc. 1-1 at 2.) Agent Hoffmann asked defendant what the hard object was, to which defendant replied that it was "his dick." This response demonstrated defendant's unwillingness to cooperate with the investigatory patdown. Because the agents suspected that they were interrupting a narcotics transaction, the agents had safety

concerns sufficient to warrant placing handcuffs on the defendant. Doc. 14-1 at 3-4.) The investigatory stop did not become a custodial arrest when Agent Hoffmann attempted to place defendant in handcuffs.

### ii. Arrest and Search Incident to Arrest

Once defendant struck Agent Hoffmann and attempted to flee, the agents had probable cause to arrest defendant under 18 U.S.C. § 111(a)(1), which prohibits assaulting a federal officer in the performance of his official duties. The subsequent discovery of the crack cocaine in the police vehicle in which defendant was riding provided additional probable cause, as did information gathered by the agents from the other occupants of the vehicle.

Law enforcement officials may search a defendant incident to an arrest. *United States v. Robinson*, 414 U.S. 218, 235 (1973) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."). The purpose of permitting a warrantless search of the arrestee's person and the area within his immediate control is to "protect[] arresting officers and safeguard[] any evidence of the offense of arrest that an arrestee might conceal or destroy." *Arizona v. Gant,* 556 U.S. 332, 339 (2009) (citing *Chimel v. California,* 395 U.S. 752, 763 (1969)). According to the agents, based upon the suspected crack cocaine in the police vehicle and on defendant's pants, they believed that he had additional contraband concealed on his person. He was thoroughly searched, resulting in the discovery of approximately eighteen grams of crack cocaine. The search incident to defendant's arrest was therefore proper under the Fourth Amendment, and both the physical evidence and statements by the defendant were lawfully obtained.

### III. Conclusion

For the foregoing reasons, defendant's motion to suppress is DENIED. (Doc. 14.)

Dated at Rutland, in the District of Vermont, this 30th day of March, 2015.

Geoffrey W. Crawford, Judge
United States District Court